UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SAN LUIS & DELTA-MENDOTA WATER AUTHORITY and WESTLANDS WATER DISTRICT,**<br><br>Plaintiffs,<br><br>v.<br><br>**SALLY JEWELL,** *et al.***,**<br><br>Defendants,<br><br>**THE HOOPA VALLEY TRIBE; THE YUROK TRIBE; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; and INSTITUTE FOR FISHERIES RESOURCES,**<br><br>Defendant-Intervenors. | **CASE NO. 1:15-CV-01290-LJO-GSA**<br><br>**MEMORANDUM DECISION AND ORDER DENYING REQUEST FOR TEMPORARY RESTRAINING ORDER/ PRELIMINARY INJUNCTION (Docs. 2 & 5)** |

## I. INTRODUCTION

The operative Complaint in this case concerns the U.S. Bureau of Reclamation's ("Reclamation" or "the Bureau") decision to make certain "Flow Augmentation" releases ("FARs") of water beginning in August 2015 ("2015 FARs") from Lewiston Dam, a feature of the Trinity River Division ("TRD") of

the Central Valley Project ("CVP"). Doc. 1.[1] The stated purpose of the 2015 FARs is to "reduce the risk of an adult fish kill in the lower Klamath River." Environmental Assessment, 2015 Lower Klamath River Late-Summer Flow Augmentation from Lewiston Dam, EA-15-04-NCAO (August 2015) ("EA"), attached to the Declaration of Elizabeth Leeper ("Leeper Decl."), Doc. 8-2. Plaintiffs, the San Luis & Delta Mendota Water Authority ("Authority") and Westlands Water District ("Westlands") allege that by approving and implementing the 2015 FARs, Reclamation and its parent agency, the U.S. Department of the Interior ("Interior")[2] (collectively, "Federal Defendants"), acted in excess of existing statutory authorities; violated reclamation law by delivering water pursuant to the second proviso of Section 2 of the Act of August 12, 1955, Pub. L. No. 84-386, 69 Stat. 719 ("1955 Act") without first entering into a contract for delivery of that water that meets the requirements of reclamation law and policy; violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, by approving and implementing the 2015 FARs without first preparing an Environmental Impact Statement ("EIS"); and violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, and the Magnuson-Stevens Fishery Conservation and Management Act of 1976 ("MSA"), 16 U.S.C. §§ 1801 e*t seq.*, by implementing the 2015 FARs without first engaging in required consultation with relevant federal wildlife agencies. Doc. 1.

Plaintiffs filed suit in this Court on August 21, 2015, *id*., and simultaneously filed a motion for temporary restraining order and preliminary injunction, along with numerous supporting declarations. Docs. 2 & 4-15. Federal Defendants and all Defendant-Intervenors filed responses, Docs. 32 (Yurok Tribe), 33 (Hoopa Valley Tribe), 36(Pacific Coast Federation of Fishermen's Associations and the Institute for Fisheries Resources ("PCFFA")), 40 (Federal Defendants), and supporting materials on August 24 and 25, 2015. All parties have worked diligently to present this emergency motion to the

---

[1] The Complaint also contains allegations concerning FARs implemented in 2014. As this motion for injunctive relief concerns only the 2015 FARs, the Court focuses on those allegations here.
[2] The Complaint also names as Defendants in their official capacities: Sally Jewell, the Secretary of the U.S. Department of the Interior; Estevan Lopez, Commissioner of the Bureau; and David Murrillo, Regional Director of the Bureau's Mid-Pacific Region. Doc. 1.

Court in a timely manner. The Court believes the papers present the issues cogently and finds it appropriate to rule without oral argument. *See* Local Rule 230(g).

## II. STANDARD OF DECISION

The standard test for injunctive relief requires establishment of four factors by a preponderance of the evidence:

> (1) likelihood of success on the merits;
>
> (2) likelihood the moving party will suffer irreparable harm absent injunctive relief;
>
> (3) the balance of equities tips in the moving parties' favor; and
>
> (4) an injunction is in the public interest.

*Winter v. Natural Resources Defense Council*, 555 U.S. 20, 24 (2008); *Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

## III. DISCUSSION

### A. Prior Lawsuit.

This case follows on the heels of a closely related case, *San Luis & Delta Mendota Water Auth., et al. v. Jewell, et al.*, 1:13-cv-01232 LJO GSA ("*Jewell I*"), which involved a series of similar emergency motions filed and decided in the late summer/early fall of 2013 and 2014, as well as a highly complex round of motions for summary judgment, decided October 1, 2014. *See San Luis & Delta Mendota Water Auth. v. Jewell*, 52 F. Supp. 3d 1020 (E.D. Cal. 2014) ("*Jewell I* MSJ Order"). Because the *Jewell I* MSJ Order provides important context for this ruling, it is incorporated by reference herein. To summarize, the *Jewell I* MSJ Order held that while the Trinity River Record of Decision ("TRROD") did set maximum limits on, as well as minimum requirements for, releases from the TRD, because the TRROD was limited in geographic scope to the Trinity River basin, the TRROD's maximum flow limitations did not absolutely preclude Federal Defendants from releasing water from the TRD above and beyond those maximums, if the releases were intended to benefit interests outside the Trinity River basin. 52 F. Supp. 3d at 1045-51. The *Jewell I* MSJ Order then examined the alternative sources of

3

authority cited by Federal Defendants, including the first proviso of Section 2 of the 1955 Act ("Proviso 1"), which states that the Secretary of the Interior is "authorized and directed to adopt appropriate measures to insure the preservation and propagation of fish and wildlife, including, but not limited to the maintenance of the flow of the Trinity River below the diversion point...." The *Jewell I* MSJ Order concluded that the authority provided by Proviso 1 was similarly limited to the Trinity River basin and therefore capped in practical effect by the TRROD's maximum flow prescriptions. *Id*. at 1057-63. The Court noted the absence of indication in the plain language or legislative history of the 1955 Act of intent to extend the reach of the Act beyond the Trinity River basin. Critical to the Court's reasoning was the fact that an important study that formed the underpinning of the TRROD indicated that the recommendations therein, which were eventually incorporated into the TRROD, were "designed to <u>fulfill</u> fish and wildlife protection mandates of the 1955 Act." *Id*. at 1059 (emphasis added). This unequivocal statement that the study underpinning the TRROD was designed to "fulfill" the mandates of Proviso 1 undercut the rational validity of Federal Defendant's position to the contrary in the prior lawsuit (and reiterated in this one) that Proviso 1 provides authority to make releases above and beyond the TRROD's maximums to benefit fish in the lower Klamath. *Id.*[3] The summary judgment ruling is currently on appeal.

The Court further directs the reader of this ruling to the various orders addressing motions for emergency injunctive relief in *Jewell I. Jewell I*, Docs. 57, 62, 91 & 175, which reflect, among other things, this Court's evolving understanding of the factual backdrop, need for, and implications of FARs.

**B.     <u>Likelihood of Success on the Merits.</u>**

In the most recent round of motions for injunctive relief in *Jewell I*, the Court indicated its belief that "it [was] highly likely that Plaintiffs [would] prevail on at least one claim in this case. Specifically, the Court remain[ed] unconvinced by Federal Defendants' assertion that [proviso 1 of Section 2 of the] 1955 Act provided authorization for the 2013 FARs [and] Federal Defendants [] acknowledged that they

---

[3] In light of this complex reasoning, the Parties either misread or chose to oversimplify the Court's holding regarding Proviso 1 by claiming that the Court held simply that Proviso 1 was geographically limited to the Trinity River basin.

4

did not rely on any independent, alternative authorization for the 2013 FARs." *Jewell I*, Doc. 175 at 4-5. Here, in contrast, likelihood of success is far from clear. Federal Defendants and Defendant Intervenors have raised numerous other authorities in support of the FARs. Although the Court is not prepared to issue a final ruling on any of the legal issues in this case, it finds the cited authorities to be more compelling than those relied upon in the prior lawsuit. For instance, Federal Defendants now principally rely on the second proviso of Section 2 of the 1955 Act ("Proviso 2"), which states "not less than 50,000 acre-feet shall be released annually from the Trinity Reservoir and made available to Humboldt County and downstream users."[4] The present record reflects that Congress' reference to "downstream users" may have been intended to include users on the Klamath River below the confluence with the Trinity, including some users who likely would have only been concerned with instream, rather than consumptive, uses. *See* Doc. 33 at 11 (citing legislative history of the 1955 Act, including references to concerns of the Yurok Tribe regarding impacts on the lower Klamath River and its fisheries). Whether the 1955 Act's reference to "downstream users" permits Reclamation to release water for instream use is a matter that is neither fully briefed nor entirely clear. Other issues pertaining to Proviso 2 are raised in the papers, including: (a) whether the existing contracts for deliveries from the TRD are sufficient to permit Reclamation to implement the FARs pursuant to Proviso 2; and (b) whether Federal Defendants' state permits to operate the TRD permit the use of any such water in the lower Klamath.

      Not directly mentioned in any of the moving papers or responses is the fact that the 2015 FARs, as planned, may utilize more than 50,000 AF of water, thereby requiring additional authority, above and beyond Proviso 2. Federal Defendants cite alternative authorities, including the 1984 Trinity River Basin Fish and Wildlife Management Act of 1984, Pub. L. No. 98-541, 98 Stat. 2721, as amended in 1996, Pub. L. No. 104-143, 110 Stat. 1338, and the Fish and Wildlife Coordination Act, 16 U.S.C. § 663, among others. These authorities merit close examination.

---

[4] Although the Court indicated in footnote 23 of the *Jewell I* MSJ Order that the authority provided by Proviso 2 may not necessarily extend beyond the Trinity River because Humboldt County encompasses part of the Trinity River mainstem, the scope of Proviso 2 was not before the Court at that time and has not been determined.

5

The Hoopa Valley tribe also presents a compelling argument why the federal government may be able to find independent authority to implement the FARs to satisfy tribal trust obligations arising in the lower Klamath. Doc. 33 at 14 -15. However, once again, Federal Defendants do not directly rely on this authority. While Federal Defendants mention the subject in the background section of their brief, the issue is not mentioned within Federal Defendants' discussion of likelihood of success on the merits. See generally Doc. 40.

Finally, Plaintiffs argue they are likely to succeed on their NEPA claim. Specifically, Plaintiffs maintain the EA is inadequate because it fails to take a hard look at certain environmental consequences of the FARs, consequences that are significant enough to warrant preparation of an EIS. Doc. 6 at 16-19. Yet, Federal Defendants, at least for purposes of this emergency motion, have countered with compelling arguments, namely that Reclamation reasonably concluded that because the volume of water required for the 2015 FARs is small in relation to the total amount of CVP water delivered to all CVP contractors, the impact of the 2015 FARs on water deliveries would not rise to the level of significance warranting an EIS. Doc. 40 at 28. On the present record the Court cannot conclude that it likely that Plaintiffs will prevail on their NEPA claim.

In sum, Plaintiffs' success on the merits is far from clear. Even assuming, *arguendo*, Plaintiffs are likely to succeed on the merits of at least one of their claims, injunctive relief would nevertheless be inappropriate, as the balance of the harms tips strongly in favor of allowing the FARs to proceed.

C.  **Irreparable Harm/Balance of the Harms.**

   1.  **Projected Water Cost of the 2015 FARs.**

The EA and its associated Finding of No Significant Impact ("FONSI") authorized implementation of the FARs in 2015, which include "supplemental flows (up to [51,000 acre feet ("AF")]) to prevent a disease outbreak (preventative flow), a preventative pulse flow, and a contingency volume (up to [37,000 AF]) to be used on an emergency basis to avoid a significant die-off of adult salmon." EA at 1. The preventative flow would target a flow of 2,800 cubic feet per second ("cfs") in

the lower Klamath River through September 20, 2015. *Id*. at 14. If certain conditions are met, a 3-day pulse peaking at 5,000 cfs in the lower Klamath River may be implemented. *Id*. If a severe Ich infection is identified, a further emergency flow to target 5,000 cfs for up to five days may also be implemented. *Id*. The total volume of the authorized preventative flows with the emergency response would utilize 88,000 AF. *Id*. at 13. "An adaptive management approach that incorporates real-time environmental and biological monitoring by Federal, State and Tribal biologists (technical team) [will] be used to determine if and when to implement these three components of the Proposed Action." *Id*.

Reclamation began implementing the 2015 FARs on August 21, 2015 at approximately 1:00 pm, by targeting a flow of 2,800 cfs in the lower Klamath River. Declaration of Paul Zedonis ("Zedonis Decl."), Doc. 40-2 at ¶ 6. The flow in the lower Klamath stabilized at approximately 2,800 cfs beginning on Monday, August 24, 2015. *Id*. Although the forecasted estimated volume of water necessary to meet both the preventative and emergency augmentation flows authorized by the EA and FONSI was 88,000 AF, under current conditions, the actual volume of water needed to implement both the preventative and emergency flows would be less than 88,000 AF. *Id*. Dr. Jonathan Strange estimates that the preventative flows at 2,800 cfs will likely obviate the need for emergency flows, thereby reducing the total volume of water needed to approximately 51,000 AF. Declaration of Jonathan Strange ("Strange Decl."), Doc. 28 at ¶ VI.12; *see also* Declaration of Michael Belchik ("Belchik Decl.") at ¶ 35 (providing similar estimate for water costs from August 25-September 20, 2015).

2. **<u>Current Drought Conditions</u>**

California is still in the grip of an historic drought. Declaration of Ronald Milligan ("Milligan Decl."), Doc. 40-4 at ¶ 1;*see also Friant Water Auth. v. Jewell*, 23 F. Supp. 3d 11 1130, 1140 (E.D. Cal. 2014). CVP agricultural water service contractors north and south of the Delta, including most of Plaintiff San Luis & Delta-Mendota Water Authority's ("Authority") member agencies, received a contract allocation of zero (0) percent in 2014 and 2015. Declaration of Thomas Boardman ("Boardman Decl."), Doc. 9, at ¶¶ 10-11. In 2014, members of the San Joaquin River Exchange Contractors Water

Authority ("Exchange Contractors") and wildlife refuges south of the Delta, both whom are members of the Authority, received a 65 percent allocation. *Id*. at ¶ 10. In 2015, those allocations are likely to be similar. *See id*. at ¶ 11.

### 3. **Impact on Plaintiffs of Using Water for the 2015 FARs.**

Plaintiffs break down into several categories the possible impacts to their interests. First, they claim there will be impacts this year to Reclamation's ability to augment supplies to certain categories of CVP water users. In particular, Plaintiffs point out that Reclamation has special contractual commitments and statutory obligations to the Exchange Contractors and wildlife refuges. Declaration of Ricardo Ortega ("Ortega Decl."), Doc. 13, at ¶¶ 7-8. Additional deliveries are sorely needed this year by both groups of Authority members. For example, Ricardo Ortega, the General Manager of the Grasslands Water District, a California public agency that operates and maintains the water conveyance system that delivers CVP water to eight wildlife habitat areas in the western San Joaquin River Valley, states that the current Level 2 water allocation (likely to be less than 75%) to the CVP wildlife refuges will not provide enough water to keep waterfowl and other species, including threatened and endangered species such as the giant garter snake, healthy and alive this years. Ortega Decl. at ¶¶ 18-21. Thomas Boardman, a Water Resources Engineer with the Authority, asserts that any water allocated to the 2015 FARs could be used to support allegations to south-of-Delta Exchange Contractors and wildlife refuges. Boardman Decl. at ¶ 52. However, the extent to which the 2015 FARs will impact Reclamation's ability to augment supplies to the Exchange Contractors and/or CVP wildlife refuges in 2015 is unclear. *See generally* Milligan Decl.

There is also a concern that the 2015 FARs may impact contract allocations in 2016. Operational forecasts indicate that a zero (0) percent initial allocation for south-of-Delta agricultural water service contractors next year is likely. Boardman Decl. at ¶ 41. According to Mr. Boardman, Trinity Reservoir is very unlikely to refill in 2016, and hence the water in storage in the reservoir next year will likely be lower by the full amount of the 2015 FARs. *Id*. at ¶ 32. The government does not dispute the general

assertion that storage will likely be reduced by the 2015 FARs (and was reduced by the 2014 FARs) and that this may have "additional contributing impacts to the CVP as a whole." Milligan Decl. at ¶ 4.[5]

The Court has reviewed the present record and believes it is again appropriate to incorporate by reference its prior findings with respect to the impact of water supply reductions on Plaintiffs:

> The record establishes that the water supply situation in Plaintiffs' service areas is already dire, with resulting economic and environmental harms. *Se*e Docs. 17- 22. Although it is true that current conditions on the ground cannot be traced to the [] flow augmentation plan, it is equally true that every additional acre foot of surface water Plaintiffs is able to obtain from the CVP will help alleviate these harms. *See* Doc. 20 at ¶ 9 ("even a small increase in surface water" would help offset the harms caused by increased groundwater use).

*Jewell I*, Doc. 91 at 16.

As this Court has mentioned in previous orders, two additional things must always be considered when evaluating harm to CVP water users. CVP operators are subject to numerous legal and contractual obligations. Even if the 2015 FARs were not permitted, there is no guarantee that any additional water supply would ever end up in Plaintiffs' hands. For example, while certain of the Authority's members have priority contracts with Reclamation, others hold contractual rights to CVP water that are junior to many other CVP contract holders and subject to diminishment for numerous other reasons, including satisfying needs of species listed under the Endangered Species Act ("ESA"). *See generally O'Neill v. United States*, 50 F.3d 677 (9th Cir. 1995).

//
//

---

[5] Plaintiffs also express concern that the 2015 FARs may impact their ability to take advantage of transfer water they already have purchased from willing sellers. *See generally* Declaration of Frances Mizuno ("Mizuno Decl."), Doc. 14. The Authority entered into various water transfer agreements this year at a cost of $665 per AF. *Id*. at ¶ 8. Willing sellers began making the transfer water available via various mechanisms in May of 2015. *Id*. at ¶ 12. However, the Authority has agreed that the transfer water will not be conveyed and pumped to the buyers until October and November. *Id*. at ¶ 13. This shift in timing is to ensure that appropriate water temperatures can be maintained in the Sacramento River for winter-run Chinook salmon. *Id*. at 13. Although the transfers are currently scheduled and on target, *id*. at ¶ 20, there is some concern that revised temperature management protocols for the Sacramento River may disrupt the transfer process, *id*. at ¶ 18-20. Frances Mizuno, the Assistant Executive Director of the Authority, indicates his belief that if the 2015 FARs do not occur, the water that would have been used for the 2015 FARs could be used in ways that would alleviate any risk posed by the revised temperature management protocols upon the water transfer process. *Id*. at ¶ 22. In light of the fact that Plaintiffs admit the water transfer schedule remains on target, however, the Court finds this risk to be speculative.

### 4. **Potential Harm to the Environment if Augmentation is Not Permitted.**

On the other side of the balance, the flow augmentation releases are designed to prevent a potentially serious fish die-off from impacting salmon populations entering the Klamath River estuary. *See* EA at 6-7. There is no dispute -- and the record clearly reflects -- that the 2002 fish kill had severe impacts on commercial fishing interests and tribal fishing rights, and that another fish kill would likely have similar impacts. *See, e.g.*, Belchik Decl. at ¶ 8 (discussing how Chinook salmon are "vitally important to the Yurok Tribe and its members for sustenance, cultural values, and economic opportunities"); Doc. 36 (PCFFA Opposition) at 6 (citing prior orders of this Court).

For the sake of efficiency, the Court will begin its analysis of the need for the action by referencing to its prior analysis of the subject following a hearing on the merits of Plaintiffs' 2013 request for a preliminary injunction:

> All experts appear to be in agreement that there were certain "contributing factors" to the 2002 fish kill. 8/21/13 RT at 42-43. First, there were "remarkably low flows" during August and September of 2002. *Id*. at 42:4-5. Second, there were "crowded fish conditions," due both to the relatively large run size and the relatively large percentage of that run made up of Klamath sub-basin fish, which fish tend to linger for extended periods of time in the lower reaches of the Klamath before initiating further upstream migration. *Id*. at 42:5-11, 54:7-18. Finally, there were some migration delays and relatively high temperatures. *Id*. at 42: 8-11.
>
> Dr. Joshua Strange, who among the testifying experts appears to have the most relevant background, education and experience relative to the key issues, emphasized the importance of the flow component in light of the biology of the Ich parasite. Ich, a ciliated protozoan, *id*. at 45:6-7, has a very well understood life cycle, *id*. at 138:23-139:2. It has a free-swimming infectious stage, during which time it must find a host fish or die. *See id*. at 137:9-14. Ich cannot live for long in open water, and usually only has 72 hours to find a host. *See id*. at 139:21-23. Once it locates a host, it must attach itself and "burrow in" to the host, where it is able to feed on the fish's fluids and mature. *Id*. at 137:9-14. After reaching maturity, it exits the fish and drops into the river, where it divides and then bursts, releasing free-swimming offspring into the water. *Id*. at 137:15-20.
>
> In its free-swimming stage, Ich is a weak swimmer, *id*. at 139:14, relying on tiny hairs to provide mobility, *id*. at 137:20. This poor swimming capability is what makes flow so important to disrupting the parasite's life cycle. If water velocities are higher, Ich will have more trouble successfully contacting a fish using its chemosensory abilities. *See*

*generally id.* at 142-43. Higher flow also can interfere with the "delicate docking procedure" Ich must undertake to attach to its host fish. *Id.* at 143:5-9.

Fish density is also important to Ich transmission, because, in a nutshell, the more fish surface area available for contact, the greater chance Ich will find a place to land. *Id.* at 141:3-12. Temperature can also have some impact on Ich transmission rate, as Ich matures more quickly at warmer temperatures. *Id.* at 141:17-142:7.

Dr. Strange has examined Ich in the Klamath in detail relative to the factors identified after the 2002 fish kill. Flows in the lower Klamath rarely drop below 2500 cfs. *Id.* at 148:10-11. The average flow for that location from the last week of August to the third week of September is 3200 cfs. *Id.* at 148:18-19. There have only been two years in which flows dropped below 2500 cfs and the run size was relatively large. *Id.* at 149:7-14. One of those years was 2002, the year of the fish kill. The other was 1988, which experienced no fish kill. *Id.* at 149:7-19. Dr. Strange opined that this pattern could be interpreted in one of two ways. Either there is a 50/50 chance of a fish kill under similar circumstances, or there may be a distinction between the two years. *Id.* at 149-151. He indicated that one possible distinction was the relatively high level of harvest in 1988, which might have minimized crowding that year. *Id.* at 155:10-16. In either case, he believes there is a "significant level of risk" of an Ich outbreak should similar conditions be permitted to prevail. *See id.* at 162:6-15.

He supported this opinion with examples of Ich outbreaks from other river systems, namely several outbreaks in British Columbia and another in Butte Creek, a tributary to the Sacramento River. Strange Decl., Doc. 86, ¶ 3.3. He further explained that Ich is believed to be always present in the background in the lower Klamath, residing in resident fish species. *Id.* at 146:14-17.

In his opinion, flows of 2,500 cfs are the absolute minimum required for a reasonable level of confidence that an Ich outbreak is unlikely to occur. Strange Decl. ¶ 4.1. In years with larger projected run sizes, he recommends maintaining a slightly higher base flow of 2,800 cfs. *Id.* at ¶ 4.2. Plaintiffs' expert Dr. Hanson did not disagree with this general approach from a biological perspective, although he pointed out that there is simply an absence of information that would permit a "finer level of resolution" to evaluate "incremental effects of …changes in management strategies." 8/22/13 RT.

Dr. Strange emphasized the importance of preventing an Ich outbreak before one occurs, given that it is very difficult to get ahead of the disease once it takes hold in a population. 8/21/13 RT at 146-47.

*Jewell I*, Doc. 91 at 16-18 (footnotes omitted).

Plaintiffs' central argument for injunctive relief against the 2015 FARs is based, at least in part,

11

upon the circumstances surrounding the 2014 FARs. In 2014, based upon flow conditions, the presence of Ich, and the anticipated run size, Dr. Strange recommended a target flow of 2,800 cfs in the lower Klamath River. Strange Decl. at ¶ V.3. Instead, Reclamation chose to implement a 2,500 cfs target. *Id*. Subsequently, a disease outbreak was identified. *Id*. at ¶ III.11. This led Reclamation to make a large 7-day emergency release, consisting of 5 days of flow doubling and 2 days of ramping down flows. *Id*. at V.4. No mass mortality occurred. *See id*. Plaintiffs argue that "the data from 2014 demonstrate that increased flows do not prevent severe Ich infection, and that severe Ich infection of most of the salmon in the lower Klamath River does not mean there will be disease and a large fish die off." Doc. 6 at 3-4. Dr. Strange disagrees, opining that it was the emergency releases that "most likely prevented mass mortality." Strange Decl. at ¶ V.4. Dr. Strange also opines that "[w]hile it is impossible to know with certainty, or redo the events of 2014, the answer to the [] question[] why an Ich outbreak occurred in 2014 is that [] the FARs [targeting 2,500 cfs] were insufficient." *Id*. at V.3.

Plaintiffs' expert, Dr. Charles Hanson, also opines that the specific flow prescriptions called for in the FARs are necessary. While Dr. Hanson does not dispute the underlying scientific premise that increased water velocity reduces the probability of Ich exposure and infection, Declaration of Charles Hanson ("Hanson Decl."), Doc. 11, at ¶ 8, he notes that the only controlled studies regarding the water velocities required to disrupt Ich involved velocities far lower than those called for by the FARs. *Id*. at ¶¶ 16-17. But, Dr. Strange, who has highly specific subject matter expertise pertaining to Ich infections in wild salmonids in the lower Klamath, points out that those studies were conducted in a hatchery environment and that such absolute numbers do not translate neatly to the wild. Strange Decl. at ¶ III.4. Dr. Strange's conclusion on this issue is supported by the historical experience of 2014, where an Ich infection did spread (although did not result in mass mortality) when flows were targeted at 2,500 cfs. The Ninth Circuit has made it abundantly clear that the government may act to set flow prescriptions even in the absence of specific evidence quantifiably justifying the specific flow chosen. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 621-24 (9th Cir. 2014).

Dr. Strange's declaration also provides sufficient information to justify the need for FARs this year. According to Dr. Strange, who has evaluated river conditions, projected flows, and likely run size for 2015, "2015 is experiencing almost the exact same summer conditions and flows as the extreme year of 2014, with 1977 being the only year with worse flow conditions." Strange Decl. at ¶ VI.1. The run size forecast is 119,000 adults (plus an unpredicted number of jacks). *Id*. Dr. Strange concludes that "the risk of an outbreak based on flows alone is [] equivalent to 2014 and more likely to occur than not without the FARs." *Id*. However, Dr. Strange also "predict[s] with a high level of confidence that background levels of Ich are significantly elevated relative to 2014, which adds a significant amount of risk for an outbreak in 2015 relative to 2014." *Id*. The 2015 FARs "have been developed with this increased risk in mind in order to reduce the risk of an Ich outbreak and mortality, and the probability of needing emergency flow releases." *Id*. The Court finds that the circumstances justify the planned 2015 FARs as a measure needed to prevent a fish kill that could significantly impact this year's fall-run Chinook in the lower Klamath.

**D.      Harm to Fish and Other Aquatic Species in the Trinity and Sacramento Rivers.**

Plaintiffs' expert Dr. Hanson asserts that the 2015 FARs will harm fish and other aquatic species in the Trinity and Sacramento River systems. Of primary concern to Dr. Hanson is that, in his opinion, the 2015 FARs will harm the winter-run Chinook salmon and Central Valley spring-run Chinook salmon in the Sacramento River, which are listed as endangered and threatened under the ESA. This is because the FARs may impact the pool of cold water available to maintain cooler temperatures in the upper Trinity River and the upper Sacramento River, which may impact winter-run and/or spring-run salmon egg incubation in late 2015 and early 2016. Hanson Decl. at ¶¶ 20-26. It is undisputed that, despite government assurances that Reclamation had sufficient cold water in storage to meet temperature requirements in 2014, temperature compliance criterion were exceeded through much of September and October 2014. *Id*. at ¶ 24. This resulted in high levels of mortality of winter-run Chinook. *Id*.

Dr. Hanson opines that the 2015 FARs may compromise temperature management for winter-run

Chinook salmon in 2016 by "reduce[ing] the storage (and in particular the cold water storage) in Trinity Reservoir by the volume of the releases," which in turn "may impact cold water storage and temperature management for ESA-listed species in 2016, if the Trinity Reservoir does not refill in 2015-2016." *Id.* at ¶ 26. But, other record evidence indicates that TRD storage has little impact on cold water pool management. According to Dr. Strange, inter-basin transfers (i.e. from TRD to the Sacramento River basin) are "not an important contributor to improved water temperatures" because the Trinity River "contributes warmer water to the Sacramento than releases from Keswick [(located below Shasta Reservoir)]." Strange Decl. at ¶ VI.6. While this is definitely an ongoing concern, Plaintiffs have not established that the 2015 FARs are likely to contribute significantly to any failure by Reclamation to meet the temperature needs of salmonids in the Sacramento River in coming months.

**E.    Public Interest.**

As this Court has previously explained:

> Both sides of this dispute represent significant public interests. Federal Defendants and Defendant Intervenors correctly point out that the federal government has invested large sums of money into the restoration of the fisheries in question. Yet, it is equally true that the government has and continues to invest in the long-term viability of agriculture in the Central Valley. Neither side holds veto power over the other.

*Jewell I*, Doc. 91 at 19.

## IV. CONCLUSION AND ORDER

The Court concludes that there is no clear showing of likelihood of success on the merits. Even if Plaintiffs are likely to succeed on the merits of at least one of their claims against Reclamation in connection with the 2015 FARs, the balance of the harms does not warrant an injunction at this time. The potential harm to the Plaintiffs from the potential, but far from certain, loss of added water supply in 2015 or 2016 does not outweigh the potentially catastrophic damage that "more likely than not" will occur to this year's salmon runs in the absence of the 2015 FARs.

There will be those who credit the Court for this decision, and those who will discredit the Court for this decision. Let it be understood by both camps that the Court is obligated to follow the law as it is.

14

That has occurred, regardless of the absence or presence of the popularity of the ruling.

Plaintiffs' TRO/PI Motion is **DENIED.**[6]

IT IS SO ORDERED.

Dated: **August 26, 2015**              /s/ Lawrence J. O'Neill
                                         UNITED STATES DISTRICT JUDGE

---

[6] In prior a prior order the Court warned Federal Defendants to be on notice that the Court will view future FARs (and requests to enjoin them) in light of all the circumstances, including the fact that Federal Defendants repeatedly have treated as "emergency" circumstances that appear to merit a consistent, reasoned, policy rationale. All involved deserve a reasonable opportunity to challenge any such rationale, and all interested, including the Court, deserve to be able to give to these issues "the time and attention [they] deserve." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 606 (9th Cir. 2014). The Court notes that Federal Defendants have taken steps to engage in long-term planning for the needs of fish in the lower Klamath, a process that is not yet complete. *See* Declaration of Federico Barajas ("Barajas Decl."), Doc. 40-1, at ¶¶ 3-5.